**Tyressa Jane ROHRBOUGH, an infant who sues by Donald E. ROHRBOUGH, her parent and next friend, and Donald E. Rohrbough and Debby S. Rohrbough, Plaintiffs,**

v.

**WYETH LABORATORIES, INC., a corporation, Defendant.**

Civ. A. No. 85–121–C.

United States District Court,
N.D. West Virginia,
Elkins Division.

Aug. 10, 1989.

---

Kathy Allen, Gerald Jones, Larry O. Ford, Jones, Williams, West & Jones, Clarksburg, W.Va., for plaintiffs.

John M. Slack, III, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., Hedy M. Powell, Wyeth Laboratories, Philadelphia, Pa., Lowell S. Fine, Jane Fugate Thorpe, Harvey Spiegel, Alembik, Fine & Callner, P.A., Atlanta, Ga., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

The minor plaintiff in this action suffers from a mixed seizure disorder that she claims was caused by a vaccine manufactured by the defendant. The defendant now moves for summary judgment on all claims, and in a separate motion claims that the plaintiff has failed to present sufficient evidence that Wyeth's vaccines caused the plaintiffs' injuries.

### I. Background

Wyeth manufactures Wyeth Diphtheria and Tetanus Toxoids and Pertussis Vaccine Absorbed Aluminum Phosphate Absorbed Ultrafined Triple Antigen ("Wyeth DTP"), a combination of three immunizing agents for use in immunization of infants and children against the diseases of diphtheria, tetanus and pertussis, or whooping cough. Wyeth also manufactures Wyeth Diphtheria and Tetanus Toxoid Absorbed Aluminum Phosphate Absorbed Ultrafined Pediatric ("Wyeth DT"), a combination of diphtheria and tetanus toxoids used to immunize infants and children against diphtheria and tetanus.

The minor plaintiff was born on September 14, 1983. She was first administered a DTP vaccine on November 29, 1983, and suffered no unusual effects. She was administered a DTP vaccine on February 2, 1984. That vaccine was from Lot 74101 of the Wyeth DTP. Later that day, she suffered a seizure which required hospitalization. She was administered a half-dose of Wyeth DT on March 22, 1984. The following day, she experienced another seizure. Since that time she has become profoundly retarded and has suffered repeated seizures, which some doctors have diagnosed as a seizure disorder described clinically as Lennox–Gastaut Syndrome. Lennox–Gastaut is a label for a set of symptoms, rather than an identifiable disease. The minor plaintiff and her parents are now suing Wyeth, claiming design and manufacturing defects, breach of express and implied warranties and failure to warn.

Ideally, vaccines are manufactured from portions of the bacteria that cause a particular disease or the toxins that the bacteria naturally secrete. Many vaccines, such as the tetanus component of Wyeth's DTP, do not actually include parts of the bacteria; rather, they are manufactured by collecting the toxins secreted by the bacteria, rendering them harmless (known as converting the toxins to toxoids), and making the vaccine from the toxoids. In other cases, the

vaccine may be manufactured from portions of the bacterium cell. Unfortunately, the medical community is uncertain which toxins or proteins are necessary components of a pertussis vaccine. Therefore, the Wyeth DTP vaccine, approved by Bureau of Biologics of the Food and Drug Administration (FDA), is a "whole cell" vaccine. That is, it is manufactured from whole killed cells of *Bordetella pertussis*, the bacteria that causes pertussis. Making a vaccine from the whole cell apparently guarantees that all of the necessary components are included. Whole cell vaccines are the only type approved for use in this country, and the federal government allegedly encourages administration of the whole cell vaccine to all children.

Although the whole cell vaccine has proven very effective in preventing pertussis, it also causes side effects in a small percentage of the population. These side effects may range from temporary swelling around the point of injection to the severe seizures and brain damage suffered by Tyressa Rohrbough. Because of these side effects, researchers are attempting to develop an "acellular" vaccine that is either made from toxins or that includes only the components necessary to prevent the disease. To date, several acellular vaccines have been developed, including two known as "B" and "T" type. No acellular vaccine has been approved for use in the United States, because the FDA is not convinced that existing acellular vaccines are either as effective as the whole cell vaccine or any safer.

The defendant is moving for summary judgment, arguing that the plaintiffs cannot sustain their burden of proof on any claim, and also that the plaintiffs' expert witnesses have not been able to offer any affirmative evidence of causation.

## II. Causation

In order to maintain a cause of action in tort against the defendant, the plaintiffs must establish that the defendant's vaccines caused the minor plaintiff's injuries. Because the subject matter of the case is of a high degree of scientific complexity, proof of causation must be by expert testimony. *Hicks v. Chevy,* 358 S.E.2d 202, 205 (W.Va.1987); *Fitzgerald v. Manning,* 679 F.2d 341, 350 (4th Cir.1982). Because the defendant has moved for summary judgment, the plaintiffs may not rest on their pleadings, but must come forward with evidence—in the form of affidavits, deposition testimony, answers to interrogatories or admissions—that demonstrates the existence of a genuine issue of material fact. F.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The plaintiffs have offered the testimony of three experts: Dr. John Tilelli, an expert in pediatrics and toxicology, Dr. Patricia Crumrine, an expert in pediatric neurology and the plaintiff's treating physician, and Dr. William Cox, an expert in pathology.

Dr. Tilelli's only statement on the subject of causation was that, "Use of the descriptive term Lennox Gastaut to describe the seizure pattern displayed by Tyressa Rohrbough would not contraindicate DTP vaccine as a possible cause of her injuries." Tilelli Affidavit at paragraph 17. Dr. Crumrine testified that she could not "say to a reasonable degree of medical certainty" that the plaintiff's seizure disorder would be any different had she not received the two vaccinations she did, Crumrine Deposition at 85, or that the disorder was due to the vaccine. *Id.* at 40. Neither Dr. Tilelli nor Dr. Crumrine is willing affirmatively to attribute the minor plaintiff's injuries to the vaccine, although neither is willing to rule it out.

Dr. Cox testified at his deposition, on November 22, 1988, that he does not believe that the *DT* vaccine causes brain damage. Cox Deposition at 139. As for the *DTP* vaccine, he gave a series of possible "mechanisms" by which it may cause injury, but was unable to state which of these mechanisms might have been at work in the plaintiff, and admitted that it was possible that none was. *Id.* at 74. He testified that he would defer to the pediatric neurologist concerning the plaintiff's diagnosis, *id.* at 128, but was willing to state that, if the minor plaintiff had infantile

spasms or Lennox–Gastaut, "it would be unrelated to her DTP." *Id.* at 117.

The strongest testimony that Dr. Cox could muster in favor of the plaintiffs' case during his deposition was that, in his opinion, "following the second immunization shot that she received, ... the manifestations that she subsequently demonstrated were consistent with those which have been repeatedly demonstrated in the literature to be associated with a reaction to the pertussis component of DTP." Cox Deposition at 24. This simply says that the reaction and the vaccine have been *temporally* linked in other cases; it does not say that they have been *causally* linked in other cases, much less in the present case.

■■■ Were the above the only expert opinion available, summary judgment would be unproblematic. There is nothing in the deposition testimony of Drs. Crumrine or Cox, or the affidavit of Dr. Tilelli that affirmatively supports the plaintiffs' theory of causation. However, in an affidavit dated May 9, 1989, 'and attached to the plaintiffs' Memorandum in Opposition to Wyeth Laboratories, Inc.'s Motion for Summary Judgment on Causation Issues, Dr. Cox states:

> 9. It is my opinion that the DPT vaccine administered to Tyressa Rohrbough on February 2, 1984 caused the neurological injuries from which she has suffered and continues to suffer.

Standing alone, this statement would defeat the motion for summary judgment. For two different reasons, however, this statement may not be eligible to play this role. First, if a statement in an affidavit that contradicts earlier deposition testimony constitutes an attempt by the nonmoving party to create a sham issue of fact, it may be disregarded. Second, an expert opinion, submitted in opposition to a summary judgment motion, may be disregarded if it is not supported by facts.

■■■ Six circuits, including the Fourth, have held that "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987);

*Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986); *Foster v. Arcata Associates, Inc.,* 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *Barwick v. Celotex Corp.,* 736 F.2d 946, 959–60 (4th Cir.1984); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365–66 (8th Cir.1983); *but see Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir.1980). This is so because, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969).

The Tenth Circuit notes that a district court should not automatically disregard the affidavit because it conflicts with earlier deposition testimony, but should "disregard a contrary affidavit when [it] conclude[s] that it constitutes an attempt to create a sham fact issue." *Franks,* 796 F.2d at 1237. Likewise, the Eighth Circuit urges "extreme care" in examining possible sham issues of fact. *Camfield Tires,* 719 F.2d at 1366. Finally, the Seventh Circuit suggests circumstances under which a contradictory affidavit might be acceptable. "An inconsistent affidavit may preclude summary judgment ... if the affiant was confused and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth newly discovered evidence." *Miller v. A.H. Robins,* 766 F.2d 1102, 1104 (7th Cir.1985). In view of these well-taken warnings, this Court will examine Dr. Cox's testimony in order to discern whether it resulted from confusion or lack or evidence, or was in fact an attempt to create a sham issue of fact.

Dr. Cox's affidavit contradicts his deposition testimony on the issue of causation. In his deposition, he admits that he is not an expert in pediatric neurology, and states

that he would defer to a pediatric neurologist concerning the diagnosis of the minor plaintiff's ailment. Cox Deposition at 116–17, 128. Dr. Crumrine has diagnosed the minor plaintiff as suffering from Lennox Gastaut syndrome. Crumrine Deposition at 77. In spite of his admitted lack of expertise, Dr. Cox ventures to state in his deposition that if the minor plaintiff had infantile spasms or Lennox–Gastaut, "it would be unrelated to her DTP." Cox Deposition at 117. These two deposition statements contradict the statement, in paragraph 9 of his affidavit, that he believes that the minor plaintiff's injuries resulted from the vaccine. No explanation is offered for this change in his opinion, nor does the doctor point to new evidence that came to light in the period between the deposition and the affidavit.

Dr. Cox's deposition and affidavit contain yet another contradiction, albeit on an issue not before the Court in the Motion for Summary Judgment on Causation Issues. Dr. Cox states in his deposition that there is "no ... statistically significant difference in the incidence of ... permanent neurological reaction" between the vaccine produced by Wyeth and the so-called "acellular" vaccine that the plaintiffs claim is safer, Cox Deposition at 96–97; in his affidavit, he states that "if Tyressa Rohrbough had received an acellular DTP vaccine rather than the whole-cell DTP vaccine manufactured by Wyeth that she would not have received the injuries from which she presently suffers." *Id.*, paragraph 10. In addition, a cursory review of the deposition testimony submitted by the parties and the affidavit reveals a cautious, circumlocutory doctor in the former and a concise, unhesitant one in the latter. Again, there is no explanation in the affidavit for why Dr. Cox is suddenly so willing to offer his unqualified opinion that the vaccine caused the injuries, when he had earlier only been willing to defer to experts in pediatric neurology, and to venture that the vaccine could not have caused the syndrome that a pediatric neurologist has attributed to the minor plaintiff. This sudden change of tone, coming as it does after the ambiguities in the doctor's deposition testimony

had been pointed out in the defendant's causation brief, suggests that the affidavit may not represent the considered opinion of the doctor himself, but rather an effort on the part of the plaintiffs to create an issue of fact. This conclusion is supported by the separate contradiction concerning the comparative risk involved in the whole-cell and acellular DTP vaccines. For these reasons, the statement in paragraph 9 of Dr. Cox's affidavit will be disregarded.

■ Dr. Cox's opinion may also be disregarded if it lacks factual foundation. Although Rules 703 and 705 of the Federal Rules of Evidence allow experts to testify based on facts not in the record and on undisclosed facts, several circuits have held that these rules do not alter the Rule 56(e) requirement that affidavits submitted in connection with a summary judgment motion be supported by facts. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *Evers v. General Motors Corp.*, 770 F.2d 984, 985–86 (11th Cir.1985); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700–01 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C.Cir.1977). In his affidavit, Dr. Cox gives no hint of what facts he relied on in forming the opinion that the vaccine was the cause of the plaintiff's injuries. This is similar to the situation in *Evers*, in which the expert gave his opinion, but did not support it with facts. The Eleventh Circuit held that "a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers*, 770 F.2d at 986.

The Fifth Circuit has gone even farther, holding that not just any facts will do. In *Viterbo v. Dow Chemical*, that court notes that the expert in question relied on three different sources of facts in arriving at his conclusion that the defendant's pesticide caused the plaintiff's injuries: the plaintiff's oral history, an inconclusive test, and a study of the effect of the pesticide on rats. *Id.*, 826 F.2d at 423. The court rejected each of these as unreliable (in the case of the oral history) or insufficient to

support the opinion given, and upheld the district court's decision to exclude the expert's opinion and grant summary judgment. Especially relevant for our purposes is the court's statement that "[t]he significance of the lack of objective evidence linking [the pesticide] to Viterbo's ailments is heightened by [the expert's] admission that the symptoms could have a number of causes." Dr. Cox was unable to offer objective facts in his affidavit to support his conclusion that the plaintiff's injuries were caused by the vaccine, and he has earlier stated that he did not believe the vaccine to cause infantile spasms or Lennox–Gastaut Syndrome. Dr. Cox has failed to support his conclusory opinion with facts, and the significance of such failure is "heightened" by his earlier and more equivocal deposition testimony. His affidavit "is no more than [the plaintiff's] testimony dressed up and sanctified as the opinion of an expert," *Viterbo*, at 424, and must therefore be disregarded.

The ability of the plaintiffs to survive summary judgment on causation grounds rests on a single paragraph of Dr. Cox's affidavit. Because that paragraph is clearly an effort to create an sham issue of fact, and is unsupported by facts, it will be disregarded. In its absence, the plaintiffs have not presented sufficient evidence to meet their burden under Rule 56 as to causation issues. Summary judgment is therefore granted.

### III. Other Grounds

Although the Court grants Wyeth's motion for summary judgment on causation grounds, to ensure a complete record the Court will alternatively rule on the other grounds for summary judgment presented by Wyeth.

■ As an initial matter, Wyeth contends, and the plaintiffs do not seriously dispute, that the plaintiffs have presented no evidence that Wyeth's DT vaccine caused the minor plaintiff's injuries. In fact, Dr. Cox testified in his deposition that he did not believe the DT vaccine ever caused neurological injuries Cox deposition at 139, and Dr. Crumrine testified that she

had no opinion on the safety of the DT vaccine and could not say that the DT vaccine caused Tyressa Rohrbough's condition Crumrine deposition at 85–86, 91.

Similarly, the plaintiffs have presented no evidence that the DTP vaccine, as designed, was defectively manufactured. No impurities have been discovered, and all of the evidence suggests that Lot 74101 was manufactured and tested according to the usual procedure. Therefore, even if the plaintiffs could present some causation evidence, summary judgment would be granted as to the DT vaccine and the DTP manufacturing defect claim.

■ Plaintiffs' claim that the vaccine was defectively designed, and is thereby unreasonably dangerous, is not as clear-cut. The plaintiffs allege that an effective, safe acellular vaccine, known as "T" type, has been used in Japan since 1981, Tilelli Affidavit, and that Wyeth is liable in both negligence and strict liability for failing to develop a similar vaccine.

In *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979), the West Virginia courts essentially adopted the strict products liability doctrine of § 402A of the Second Restatement of Torts. Under the Restatement, a seller is strictly liable for any product sold "in a defective condition unreasonably dangerous" to the consumer. The *Morningstar* rule requires that products be "reasonably safe" for their intended use.

Comment k to § 402A, which has not been explicitly adopted by the West Virginia courts, makes an exception to the doctrine for "unavoidably unsafe" products. Comment k recognizes that some products, particularly some prescription drugs, are quite useful but have some risk associated with their use that cannot be eliminated. Obviously, this exception does not apply if the manufacturer could reduce the risk, because then the product would not be *unavoidably* unsafe.

The comment k issue, argued heatedly by the parties, is actually a red herring. Even if the West Virginia courts would apply the

doctrine in appropriate cases,[1] Wyeth must first demonstrate that its vaccine was "unavoidably unsafe," and the plaintiffs' entire argument is that Wyeth could have avoided the risks of the whole cell vaccine by marketing a safe, effective acellular vaccine. Thus, whether comment k applies or not it cannot be a basis for summary judgment, because its applicability rests on the factual issue of whether a safer, equally effective vaccine exists that Wyeth could have marketed.

Unlike Dr. Cox's uncertain statements, Dr. Tilelli's affidavit clearly raises a genuine issue of material fact on that predicate question. Some of the medical literature attached to the plaintiffs' experts' affidavits suggests that current technology could develop a safe and effective acellular alternative to the whole cell vaccine.[2] Whether the plaintiffs can prevail at trial is a wholly different issue; the Court merely concludes that if summary judgment were unavailable on causation grounds, the plaintiffs would have presented sufficient evidence to take the design defect claims to the jury.[3]

■ Plaintiffs also claim breach of express and implied warranty. The vial of DTP vaccine administered to Tyressa Rohrbough included a federally-approved package insert that warned of a wide range of possible side effects ranging from raised temperature to the seizures and brain damage the minor plaintiff suffered. *See* Exhibit H to Wyeth's Motion for Summary Judgment. Plaintiffs' express warranty claim focuses on Wyeth's representation in the insert that the frequency of these side effects is "unknown, but they seem to be exceedingly rare."

This equivocal language is hardly an express warranty, but in any event the plaintiffs have failed to establish a genuine issue that the "exceedingly rare" claim is a misrepresentation. Their claim rests entirely on Paragraphs 14 and 15 of Dr. Tilelli's affidavit, in which he claims that serious side effects are "quite common." He reaches this conclusion based solely on unspecified documents describing an unspecified clinical trial of DTP reactivity at UCLA. In fact, the published version of that study found a reaction rate of nine in 15,752, or 1 in 1750. *See* Cody et al., "Nature and Rates of Adverse Reactions Associated with DTP and DT Immunizations in Infants and Children," 68 *Pediatrics* 650, 658 (1981), Exhibit S to Wyeth's Reply Brief. Other studies indicate that serious reactions may be even less frequent, at a rate of 1 in 2,200 or more. *Id.* at 656. The language in Wyeth's insert is imprecise, and the Court need not determine what ratio of reactions is "exceedingly rare." As discussed more fully in the causation analysis *supra,* normally the question of factual support for an expert opinion is a question of weight, not admissibility, but where an opinion is wholly unsupported, summary judgment is appropriate. The plaintiffs have presented no evidence other than Dr. Tilelli's unsupported opinion that the package insert is false, and

---

1. It seems likely that in adopting a strict products liability rule "not substantially different" from § 402A, *Morningstar*, 253 S.E.2d at 680, the West Virginia courts would also apply the comment k exception where a product is proven to be unavoidably unsafe. *See, e.g., Smith v. Wyeth Laboratories*, No. 84–2002 (S.D.W.Va. 1986) (order granting partial summary judgment). Imposing strict liability without the exception would force manufacturers of unavoidably unsafe products, including many vital prescription drugs, either to raise substantially the price of the drugs or to stop marketing them altogether. Either result would be contrary to the consumer protection concerns that prompted the strict liability doctrine in the first place.

2. The plaintiffs also claim that Wyeth should have developed a "split-cell" vaccine, first developed by Eli Lilly & Co., after acquiring Lilly's trade secrets in 1977. The evidence clearly shows that Wyeth did manufacture and test just such a vaccine, but that the FDA rejected it on the grounds that the split-cell vaccine had not proven superior to the whole cell product.

3. Wyeth suggests that it cannot be held liable for failing to develop an acellular vaccine because the FDA had not approved any such vaccine at the time Tyressa Rohrbough received her injection. But the FDA certainly would have approved a safer, equally effective acellular vaccine if Wyeth had developed one. Assuming the plaintiffs could prove that a better vaccine exists, the lack of FDA approval does not require summary judgment.

therefore summary judgment would be appropriate on the express warranty claim.

■ The plaintiffs claim that Wyeth's vaccine was unmerchantable and unfit for its intended purpose. In addition to the Uniform Commercial Code requirement that goods "pass without objection in the trade," W.Va.Code § 46–2–314, West Virginia also requires that goods fully comply with state and federal regulations. W.Va. Code § 46A–6–102(c). Wyeth's vaccine satisfies both standards. The plaintiffs do not dispute that the vaccine generally and the lot from which Tyressa Rohrbough's dose was taken complied with all federal regulations. Nor can the plaintiffs dispute that Wyeth's vaccine would pass without objection in the trade. The whole cell vaccine is the only type of vaccine licensed for use in this country, and while the plaintiffs may be able to show that the government should license another type of vaccine, currently the whole cell vaccine is the only type *in* the trade.

Furthermore, assuming that Wyeth adequately warned of the risks associated with its DTP vaccine, *see infra*, it did not breach the warranty of merchantability. So long as the consumer accepts a product with knowledge of its dangers, the manufacturer cannot be held liable for impliedly warranting against injuries it warned the consumer might occur. *See, e.g., Watson v. Uniden Corp. of America,* 775 F.2d 1514 (11th Cir.1985) (cordless phone manufacturer warned of danger of ear damage from ring); *Dunkin v. Syntex Laboratories,* 443 F.Supp. 121 (W.D.Tenn.1977) (oral contraceptive manufacturer warned of risk of stroke); *cf.* W.Va.Code § 46–2–316(3)(a) (permitting manufacturers to exclude implied warranties by any plain language indicating exclusion). Summary judgment would therefore be granted on the implied warranty claim even if there were evidence of causation.

■ Plaintiffs next claim that Wyeth did not adequately warn them of the risks associated with its DTP vaccine. The first question here is whom Wyeth was required to warn. Wyeth asserts that under the "learned intermediary" doctrine, its only duty was to warn administering health care professionals, who could then make an informed, "individualized medical judgment bottomed on a knowledge of both patient and palliative." *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974), *cert. denied* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1987).

The plaintiffs acknowledge the learned intermediary rule but cite a line of cases that carved an exception to the rule for polio injections administered in mass immunizations. *See, e.g., Plummer v. Lederle Laboratories,* 819 F.2d 349, 356 (2d Cir. 1987) cert. denied, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Reyes,* 498 F.2d at 1276–77. However, as the Fourth Circuit has noted, " 'the exception established for the polio cases is quite narrow and highly fact specific,' " *Brooks v. Medtronic, Inc.,* 750 F.2d 1227 (4th Cir.1984) (quoting *Stanback v. Parke–Davis & Co.,* 657 F.2d 642, 647 (4th Cir.1981)); it was developed specifically for the polio vaccine, which was administered in a nationwide mass immunization program in which doctors frequently gave the vaccine without weighing the risks and benefits to a particular patient, as the learned intermediary doctrine assumes. Though Tyressa Rohrbough received the vaccine in a public health clinic, she did not receive it as part of a mass vaccination program but after talking with the Registered Nurse who ultimately made a considered medical judgment and administered the shot. *See* Affidavit of Diane Cooper, R.N., paragraphs 7–8. The learned intermediary rule therefore applies, and the plaintiffs do not contend either that Nurse Cooper was not sufficiently experienced to be a "learned intermediary" or that she was not apprised of the risks associated with the DTP vaccine.

■ Even if Wyeth owed a duty to warn the plaintiffs directly, Debby Rohrbough, Tyressa's mother, signed a consent form acknowledging that she had read certain forms describing the risks and possible side effects, and that she nonetheless requested that the vaccine be administered.

*See* Exhibit J to Wyeth's Motion for Summary Judgment.

■ Finally, Wyeth moves to strike the plaintiffs' demand for punitive damages, arguing that the plaintiffs cannot show "willfulness, wantonness, malice, or other like aggravation." *Ilosky v. Michelin Tire Corp.,* 307 S.E.2d 603 (W.Va.1983). Though the plaintiffs hang this claim on a slender reed, if there were surficient evidence of causation, they would be entitled to present evidence on punitive damages on the design defect claim. If, as the plaintiffs allege, the acellular vaccine was known for several years to be as effective and safer than the whole cell vaccine, and Wyeth knew of the improved vaccine and intentionally failed to develop it, the plaintiffs might be able to show that degree of willfulness required for punitive damages.

### *IV.  Conclusion*

The Court concludes that the plaintiffs have failed to present any competent evidence that Wyeth's DTP vaccine caused the neurological problems Tyressa Rohrbough now suffers. Even if the plaintiffs were able to establish causation, they have failed to present genuine issues of material fact concerning Wyeth's DT vaccine, manufacturing defects in the DTP vaccine, breach of express or implied warranties, or a failure to warn. Thus even if there were evidence of causation the case would proceed to trial only on the design defect claim (including the punitive damages claim).

For these reasons, the defendant's motion for summary judgment is GRANTED.

It is so ORDERED.